## Womack, et al. v. Douglas.

(Decided March 5, 1914.)

### Appeal from Boyd Circuit Court.

1. Brokers—Real Estate Brokers—Sufficiency of Contract—Compensation.—Where an owner of standing timber agreed with a real estate broker that he would take ten thousand dollars for the timber and the broker might have all he sold it for over this price, this proposition, when accepted by the broker, constituted a binding contract, and the broker, having found a purchaser for the timber at thirteen thousand dollars within the time allowed by the contract, was entitled to three thousand dollars as compensation for his services.

2. Brokers—Real Estate Brokers—Agency—Parol Contract Sufficient.—An agency to sell real estate may be created by parol, and a real estate broker in whose hands real property is placed for sale under a parol agreement is an agent and entitled to have the commission agreed upon if he succeeds in effecting a sale or if he produces, within the time allowed by the contract, a purchaser who is ready, able and willing to comply with the terms of the sale agreed upon between the owner and the agent.

3. Brokers—Real Estate Brokers—When Owner of an Interest in Property Liable for Full Commission—Exception to Rule.—A party who makes a contract placing real property in the hands of a real estate broker for sale is liable for the whole of the compensation agreed to be paid, although he did not own the land

he placed with the broker, or only owned an interest in it, and was unable to carry out his contract because he did not own it or because the other owners would not consent to the sale. An exception to this rule would exist if the broker knew the person making the contract was not authorized to make it.

4.  Joint Tenants—One Has No Authority to Bind the Others.—One joint tenant or joint owner has no implied authority to bind the others by a sale of the joint property or to impose upon the others without their consent, express or implied, any burden or liability growing out of his sale of the property, unless the contract of the one is ratified by the others after it is made.

E. E. FULLERTON, S. S. WILLIS for appellants.

DINKLE & PRITCHARD and PROCTOR K. MALIN for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellants, W. B., E. R. and W. O. Womack are brothers, and they owned the timber on a tract of land in Greenup County. The appellee, Stephen A. Douglas, was a real estate broker. Claiming that under a contract with the Womacks he was to receive as compensation for his services in selling the timber all that he could sell it for over ten thousand dollars, he brought this suit against them to recover three thousand dollars, upon the ground that after making the contract he sold the timber for thirteen thousand dollars when they refused to consummate the trade by executing the required conveyance to the purchaser.

On a trial of the case before a jury he recovered the full amount sued for, and this appeal is prosecuted by the Womacks to obtain a reversal of that judgment.

The evidence shows that the Womacks were joint owners of the timber; that W. O. and W. B. Womack were engaged in the mercantile business in Greenup County, their place of business being on or near the timber land, and that E. R. Womack was a United States mail agent on the Chesapeake & Ohio railroad which runs through Greenup County.

W. T. Hoard, a banker at Greenup, who was well acquainted with the Womacks, testified that some time in the latter part of March, 1910, in a conversation with E. R. Womack, the mail agent, Womack told him that he and his two brothers had a large tract of timber that they wanted to sell and would take ten thousand for the tract, and after this he had a conversation with Douglas

and told him what Womack said. A few days after this Douglas went to see W. B. Womack for the purpose of looking at the timber and negotiating a sale of it. Douglas testifies that after he and Womack had looked over the timber "I says, 'What do you want for your timber?" and he says, 'Ten thousand dollars.' I says, 'How I handle timber is I take your timber at your price and if I find a buyer for your timber, all that I can make over that is my commission.' He says, 'That is all right. All that we expect is our ten thousand dollars,' and I says, 'It is proper to have an article on this, but so far as I am concerned you can act on my word; what I say I will do.' He says, 'That is just exactly the way we deal; we act on our word.' * * * I says, 'Will you let me go home and see some parties that live there, and I will see them and you will hear from it right away?' He says, 'All right.' "

W. B. Womack denies that this conversation as related by Douglas took place or that he put the timber in the hands of Douglas for sale or authorized him to sell it, but admits that he told Douglas when he asked the price of the timber that they wanted ten thousand dollars for it.

A few days after this, perhaps the next day, Douglas saw Schmidtt, the manager for the H. Hermann Lumber Co. at Ashland, and, after some discussion about the timber, Schmidtt agreed to and did send his agent to inspect the timber and make a report concerning it. Upon receiving this report Schmidtt, acting for his company, agreed to take the timber and pay for it thirteen thousand dollars, and writings were drawn up between Douglas and the Hermann Lumber Co., evidencing the sale, and at the same time a writing was prepared evidencing a sale of the timber by W. B. and W. O. Womack to Douglas. Neither of these writings were signed by the parties, but it was expected and intended that both of them would be signed when the sale was finally consummated, and it might here be said that Douglas did not at this time know that E. R. Womack was interested in the timber.

A few days after this Douglas notified W. B. Womack that he was ready to close the trade and was then informed by him that he would not take ten thousand dollars for the timber. A short time after this it appears that the Womacks sold the timber to Schmidtt acting for

the Hermann Lumber Co., for $11,500.00, although Schmidtt testifies that he was willing to buy the timber from Douglas and to pay him for it $13,000.00.

Without stating more of the evidence at this time it is sufficient to say that the weight of it tends to show that W. B. Womack made the contract as related by Douglas; that Douglas within the time given to close the trade, sold the timber for $13,000.00 to the Hermann Lumber Co., and was able, ready and willing to pay the Womacks for the timber the ten thousand dollars agreed upon. It is also a reasonable inference from the evidence that after the Womacks learned that Douglas had sold the timber for $13,000.00 they set about to avoid the contract with Douglas and succeeded themselves in selling the timber to the Hermann Lumber Co. for $11,500.00. The result of this being that they got for the timber $1,500.00 more than they would have received for it under the contract with Douglas, and that Douglas lost three thousand dollars, the compensation he would have received had the contract he made with W. B. Womack been carried out.

Counsel for the Womacks insist that no contract was made, or, that if one was made, it was not a valid or enforceable contract. But the evidence we have related shows in a very satisfactory manner that a specific contract was made between Douglas and W. B. Womack, and passing for the present the effect of this contract on W. O. and E. R. Womack, we have no doubt that as between Ward Womack and Douglas the contract was a valid and enforceable one.

Under this contract Ward Womack appointed Douglas as his agent to sell this timber at a sum that would realize the Womacks not less than ten thousand dollars, and Douglas was to have as compensation all over this amount for which he sold it. This contract was equally as binding and effective as if Womack had placed the timber in the hands of Douglas for sale, agreeing to give him a certain per cent or a certain commission in the event he sold it at a satisfactory price. The contract made between Douglas and Womack was not unreasonable or unfair or indeed unusual. Nor was it required that the contract should be in writing. It has been written by this court in a number of cases that an agency to sell real property may be created by parol, and a real estate broker in whose hands real property is placed

for sale under a parol agreement is an agent and entitled to have the commission agreed upon if he succeeds in effecting a sale or in producing within the time allowed by the terms of the contract a purchaser who is ready, able and willing to comply with the terms of the sale agreed upon between the owner and the agent: Irvin v. Thompson, 4 Bibb, 295; Talbot v. Bowen, 1 A. K. Mar., 436; Monroe v. Bailey, 145 Ky., 794; Shadwick v. Smith, 147 Ky., 159.

Our attention is directed by counsel for appellant to the unreported case of Whisler v. White, 128 S. W., 297, as supporting the theory that no enforceable contract was made in this case, but there is no similarity in the essential facts of the two cases. In the Whisler case White brought suit to recover a commission that he claimed he was entitled to, growing out of a sale of timber made by him to Whisler. Whisler, under the contract, was not to pay for the timber until it was delivered, and White was unable to deliver it because Dupuy, from whom he bought the timber, would not let him have it unless he was paid in advance the purchase price, and this White could not do. So that White was unable to carry out his contract to deliver the timber and for this reason was not entitled to the commission he would have been entitled to if he had succeeded in delivering the timber. As said by the court:

"It is manifest from White's own statement that the appellant, Whisler, merely agreed to purchase of him the timber and pay therefor 18 cents per cube upon its delivery at their mill in Ironton, Ohio. This was the sole contract between the parties. White did not own the timber. In order to carry out his contract, he had to purchase the timber of Dupuy and then deliver it at the place of destination. He failed to complete his purchase from Dupuy, because the latter would not let it go unless it was paid for in advance.  *   *   * Being unable to get the timber because he could not pay for it, he failed to comply with his contract to deliver it at Ironton. Having failed to deliver it, he cannot complain that Whisler refused to pay him for the timber. His failure was due entirely to the action of Dupuy in refusing to let the timber go before it was paid for. For this Whisler was in nowise responsible. White's failure to comply with his contract released Whisler from all obligation to him."

In the case we have Douglas was able, ready and willing to pay the Womacks the price they agreed to take for their timber, and he was only prevented from performing the contract by the conduct of the Womacks in deliberately refusing to fulfill their part of it. It is apparent all through the record that the only reason the Womacks had for refusing to comply with the contract made with Douglas was the fact that after discovering the profit he was going to make, they concluded to break the contract and in this way try and save for themselves a part of the compensation that Douglas under his agreement would have made.

Another question is whether or not E. R. and W. O. Womack are liable to Douglas for the breach of this contract. The timber, as before stated, was jointly owned by the three Womacks, and the contract of Douglas was made only with Ward Womack. Douglas made no direct contract whatever with either of the other two, nor does it appear that Ward Womack told him the others had an interest in the timber.

That Ward Womack is liable for the full amount of the compensation Douglas was to receive, we have no doubt. It is well settled that a party who makes a contract like this is liable for the whole of the compensation agreed to be paid, although he did not own the land he placed with the broker for sale, or only owned an interest in it, and was unable to carry out his contract because he did not own it, or because the other owners would not consent to the sale, although there might be an exception to this rule if the broker had knowledge of the fact that the person making the contract was not authorized to do so: Rounds v. Alee, 116 Ia., 345; Oliver v. Morawetz, 97 Wis., 332; Gorman v. Hargis, 6 Okla., 360.

But one joint-tenant or joint owner has no implied authority to bind the others by a sale of the joint property, or to impose upon the others without their consent, express or implied, such a burden or liability as arises in this case, unless the contract of the one is ratified or approved by the others after it is made: Carlyle v. Patterson, 3 Bibb, 93; Pearis v. Covilland, 6 Cal., 617, 65 Am. Dec., 543; Morrison v. Clark, 89 Me., 103, 56 Am. St. Rep., 395; City of St. Louis v. Laclede Gas Light Co., 96 Mo., 197, 9 Am. St. Rep., 334.

In view of the principles stated, we will look into the evidence a little more carefully for the purpose of determining whether there was sufficient to show that Ward Womack was authorized by his co-tenants to make the contract he did make with Douglas, or if this contract was afterwards ratified by them. W. O. Womack was engaged in business with Ward Womack, and he testifies as follows:

"Q. You had nothing to do with this transaction with Mr. Douglas? A. No, sir; never saw him until to-day. Q. Did you authorize any one to sell your interest in that timber at any time? A. One time I did; yes. Q. Who was that? A. My brother Ed. Q. When was that? A. I don't know. It was just after we bought it. Q. You knew of Mr. Douglas being out that first time, didn't you? A. Yes, sir. Q. Your brother told you? A. Yes, sir. Q. Told you he had offered him the timber for ten thousand dollars? A. Yes, sir. Q. You knew of Mr. Douglas being there with Mr. Maynard? A. I did not know of Mr. Maynard being present. Q. You knew of him being there with somebody looking over the timber? A. Yes, sir. Q. You are a member of the firm of W. B. and W. O. Womack? A. I am."

E. R. Womack was asked these questions and made these answers: "Q. Did you have a conversation with Mr. Hoard there on the streets of Greenup? A. Yes, sir. Q. What was that conversation? A. Mr. Hoard asked me what we wanted for the timber, and I told him Ward was wanting to sell it for ten thousand dollars, but I was in favor of operating it. Q. Your occupation is that of a mail clerk on the trains and your brothers live where this timber was? A. Yes, sir. Q. And the handling of it you left largely with them? A. Not necessarily. Q. I didn't ask you that. I asked you if you did or not? A. Well, I was trying to get figures on operating it and Ward was trying to sell it. Q. You did not tell Mr. Hoard that you would take ten thousand dollars for that timber? A. I did not. Q. Didn't you tell Mr. Hoard at his house on Sunday morning that the reason you did not sell it to Mr. Douglas was that you could get more money for it? A. I probably told him that . Q. You also told him in that conversation that you had considered Mr. Douglas a purchaser? A. Yes, sir. Q. Did it make any difference to you all who pur-

chased it, only the amount of money? A. We were trading with Mr. Douglas as a purchaser instead of a commission man. If we had known that, we would have known how to have dealt with him. Q. You did not know who was going to get the timber? A. I know what Mr. Hoard told me. Q. What did he tell you? A. He told me that Mr. Douglas would buy the timber. Q. How did you know what the understanding was between your brother and Mr. Douglas? A. Ward told me on Sunday. Q. He told you that he had offered it to Mr. Douglas for ten thousand dollars? A. Yes, sir. Q. You understood that? A. Yes, sir. Q. You made no objection to it? A. Yes, sir; I had already made objection to it. Q. In your first conversation with Mr. Hoard you told him that your brother was wanting to take ten thousand dollars for it and you were in favor of operating it. Did you make any objection to selling that timber to Mr. Douglas for ten thousand dollars A. I don't know as I did or not. I told him the first time I was in favor of operating it and reiterated it on the second occasion. Q. I believe you say that on Monday morning when he was down there that you told Mr. Douglas that he could have it for sale on commission at $11,500.00? A. Yes, sir.''

We think this evidence was sufficient to submit to the jury the question of the three Womacks consenting to the contract made between Ward Womack and Douglas. A careful reading of the evidence convinces us that W. O. and E. R. Womack were willing that the timber should be sold for ten thousand dollars until they learned the price at which Douglas had sold it, and further that they knew the conditions of the contract between Ward and Douglas and approved it, or at least made no objection to it until they learned of the contract between Douglas and Schmidtt.

Some criticism is made of the instructions, but they submitted fairly to the jury the only issues in the case.

It is also suggested that Douglas abandoned the contract and thereafter the timber was sold by the Womacks to the Hermann Lumber Company. But the evidence shows that Douglas did not abandon the contract or cease in his efforts to secure its performance by the Womacks until after he discovered from their acts and conduct that they would not execute the contract, and then of course there was nothing left for him to do but abandon it.

Upon the whole case we think the judgment a just and meritorious one, and it is affirmed.